**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2016-KA-00257-COA**

**GERRY LOVE**                                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/03/2015 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH III |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF FIRST-DEGREE MURDER AND SENTENCED AS A HABITUAL OFFENDER TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE OR PROBATION |
| DISPOSITION: | AFFIRMED - 07/18/17 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES, FAIR AND WILSON, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.     A Boliver County jury convicted Gerry Love of the first-degree murder of Glandra Williams under Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014). Love was sentenced to life in the custody of the Mississippi Department of Corrections (MDOC) as a habitual offender under Mississippi Code Annotated section 99-19-81 (Rev. 2015) without

the possibility for parole or probation. On appeal, Love argues that the trial court erred in sustaining the State's *Batson*[1] objection during jury selection, and that he was prejudiced by the admission of hearsay testimony from a State's witness. Finding no error, we affirm.

### STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

¶2. On the afternoon of November 12, 2014, Kimberly Williams discovered the body of her forty-four-year-old mother, Glandra Williams, lying in a pool of blood on the kitchen floor of Glandra's home in Cleveland, Mississippi. Glandra had suffered a total of thirty-two stab wounds to her neck, chest, abdomen, and left hand. Additionally, her throat was slashed, severing the carotid and jugular blood vessels, exposing her larynx and voice box. Rigor mortis had set in, and one arm was bent with her hand raised up, as if in defense from her attacker.

¶3. The night before, as was their routine, Glandra kept Kimberly's two small children, because Kimberly worked the night shift at MDOC from midnight until 8 a.m. Usually, Kimberly would drop her children off at Glandra's home at approximately 11 p.m. In the morning, Glandra would put the children on the school bus. In the afternoon, Kimberly would pick her children up from school and return them to Glandra's house. Usually, Kimberly and her mother talked "all day, every day."

¶4. The morning of the twelfth, however, instead of going to her mother's house in the afternoon, Kimberly was tired and fell asleep. When she awoke, she realized she had not heard from her mother all day; so Kimberly went to Glandra's house. Upon entering, she

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

went to answer Glandra's mobile telephone, which was ringing in the bedroom. In the meantime, Kimberly's five-year-old daughter had gone into the kitchen and found Glandra's body. She told Kimberly, "Mama, Grandma is [lying] on the floor with blood all over her." Kimberly called 911.

¶5. When Investigator Ray Morris arrived at the murder scene, he found Glandra lying on her back in a large pool of blood by the utility area in the kitchen. He saw multiple stab wounds to her torso and neck. Her body had already stiffened, and her eyes were locked open, dried, and glazed. Morris noted the blood smears and splatters in the area indicating a struggle. Glandra's wallet was on the sofa in another room with blood on it. There were some towels on the sofa in a pile of laundry with blood on them. Two knives were found in the kitchen sink covered in dish water with a strong smell of bleach; one of the knives had a distinct bend in the blade. The knives were collected as evidence.

¶6. Glandra's next-door neighbor was Desirae Mason. Gerry Love lived next to Mason's house with his mother. Unbeknownst to her neighbors, Mason had four security cameras installed outside her home. One camera was positioned on the right side of her house with a full view of Glandra's house, including the side door and driveway. After learning of Glandra's murder, that evening Mason reviewed the security-video footage. Mason testified she saw the following on the video. At 8:04 a.m., Glandra's two grandchildren ran out to the school bus. Then, at 8:10 a.m., Love came across the side of her house, walked around the back of Glandra's vehicle, and then walked in the direction of Glandra's front door. From other video footage taken from a camera positioned on the back side of Mason's

house, Mason testified she saw Love "come out through the back and come through [Mason's] garage, and across to his mother's yard." Mason was able to zoom in on the individual and claimed the person was Love. Mason knew Love well, as they had been neighbors for five years and worked together "off and on" for two years. Mason did not see anyone else in the videos walking near Glandra's house. Mason called law enforcement and showed them the video footage.

¶7. Mason's best friend, Angela Castion, also knew Love because they worked together at McDonald's. The evening of November 12, Love arrived to start his shift as Castion was leaving her shift. She noticed fresh scratches under Love's eye and jokingly asked if he had been in a fight. Love responded that his cousin had scratched him.

¶8. Later that evening, Mason called Castion to come to her house and watch the video footage with law enforcement. Castion identified Love as the individual in the video because of his height and the way he walked. Castion testified that Love had a "swag leg" and a "gap walk" that was distinctive, and he was frequently teased about it. The video was paused and zoomed to aid her identification. Investigator Morris was present and testified both Mason and Castion identified Love. Castion told Morris she had just seen Love at work and noticed a scratch under his eye.

¶9. At approximately 10 p.m. that night, investigators went to question Love at McDonald's, and he was taken into custody. Love's clothing was collected. Investigator Morris noticed what appeared to be blood on his work pants, the scratch under his eye, and a fresh cut on his hand.

4

¶10.   Tommie Richardson was one of Glandra's friends, and they spoke on the telephone every morning. He testified that Glandra was in a relationship with someone who lived down the street, but Richardson did not know his name. The morning Glandra was murdered, Richardson called her at approximately 7 a.m. Richardson testified that he asked her: "'You got company?' She said 'Yes.' I said, 'Greenville?' She said, 'No.' I said, 'Indianola?' She said, 'No.' I said, 'Down the street?' She said, 'Yes.'" The State then asked him: "Had she, prior to this conversation, talked to you about someone down the street that she had been talking to?" Defense counsel objected to this question on the grounds of hearsay, and the trial court later sustained the objection.

¶11.   At trial, a serologist from the Mississippi Crime Lab testified the knives tested negative for blood; however, Love's pants tested positive for blood. A blood sample from the pants was submitted for DNA testing. A DNA expert testified that Glandra could not be excluded as a possible DNA donor from the sample. Further, for the markers tested, "the genetic profile for the DNA donor of the stain on the outside front of the pants occurred with the frequency of approximately one in greater than 10 billion."

¶12.   A rape kit was also submitted to the crime lab for testing with vaginal swabs from Glendra and her underwear. Both the vaginal swabs and underwear tested positive for semen. The DNA analysis of the vaginal swabs had a mixture of Glandra's DNA and an unknown male. Love was excluded as a contributor.

## ANALYSIS

I.    *Batson* Challenge

5

¶13. Love argues that the trial court erred in finding his three peremptory strikes on white jurors were not based on race-neutral reasons.

¶14. "Peremptory strikes may not be used for the purpose of striking jurors based solely on their race or gender." *O'Donnell v. State*, 173 So. 3d 907, 915 (¶17) (Miss. Ct. App. 2015) (citation omitted). An appellate court reviews the trial court's *Batson* ruling with great deference because "finding that a striking party engaged in discrimination is largely a factual finding." *Lynch v. State*, 877 So. 2d 1254, 1270 (¶46) (Miss. 2004) (quoting *Walker v. State*, 815 So. 2d 1209, 1214 (¶10) (Miss. 2002)). This determination turns largely on the "trial judge's evaluation of a presenter's credibility and whether an explanation should be believed." *Id.* at 1271 (¶50) (citation omitted). The ruling will not be overturned "unless it is clearly erroneous or against the overwhelming weight of the evidence." *Pruitt v. State*, 986 So. 2d 940, 942 (¶8) (Miss. 2008).

¶15. A three-part test is used to analyze a *Batson*[2] challenge:

> First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the [proponent of the strike] to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered by [the proponent of the strike], the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.

*Hardison v. State*, 94 So. 3d 1092, 1097-98 (¶17) (Miss. 2012) (emphasis omitted) (quoting

---

[2] When a *Batson* challenge is directed against the defense, as here, it is called a reverse-*Batson* challenge, but the same rules apply. *Hardison v. State*, 94 So. 3d 1092, 1097 (¶17) (Miss. 2012) (citation omitted).

6

*Pitchford v. State*, 45 So. 3d 216, 224 (¶14) (Miss. 2010)).

¶16. During jury selection, the State raised a *Batson* challenge when defense counsel had exercised four of his twelve peremptory strikes on four of the six white potential jurors. He had struck every white female available and had only accepted one white male juror. The trial judge noted on the record that white people were in the minority of the jury pool.

¶17. The burden shifted to the defense to provide race-neutral reasons for the four strikes. Defense counsel explained that he struck Number 33, a white female, because she was the principal where his child went to school, and they know each other. The trial court accepted this reason as race-neutral. Regarding Number 54, the other white female, Love's counsel stated that she works at a bank, and he intended to strike all bank employees. Counsel stated he struck Numbers 34 and 35, both white males, because they were farmers, and he intended to strike all farmers. He reasoned that bankers and farmers were more security conscious, and thus more prone to find Love guilty.

¶18. Rebutting Love's employment rationale, the State argued that there were other prospective jurors who had not been struck who worked in service industries where security would be a concern. Neither a black female who worked at Kroger, nor an individual who worked at Wal-Mart had been struck. Ultimately, the trial court found defense counsel's employment rationale was pretextual and not racially neutral, violating *Batson*. Therefore, the trial court denied Love's three peremptory challenges for Numbers 54, 34, and 35, and restored these three individuals to the jury.

¶19. On appeal, Love points out that employment is an approved racially neutral basis for

peremptory strikes. Indeed, the *Batson* Court itself expressly stated that "employment in a particular industry" is one consideration upon which a challenge might be based. *Batson*, 476 U.S. at 124. Yet the Mississippi Supreme Court "has cautioned . . . that previous opinions holding reasons to be race-neutral should not be construed to hold those reasons to be automatically race-neutral in any other case." *Pruitt*, 986 So. 2d at 945 (¶17) (citing *Lockett v. State*, 517 So. 2d 1346, 1353 (Miss. 1987)).

¶20.    Here, the trial court did not explicitly rule on whether the State established the first step of a *Batson* challenge, the prima-facie case; however, the issue is moot because the trial court required the defense to provide race-neutral reasons for exercising the peremptory strikes. *See Lynch*, 877 So. 2d at 1271 (¶48). In the second step, the burden shifts to the defense to give a race-neutral reason for the strikes, and the reason given was employment. The second step "is not a difficult task" because any reason that is facially valid will suffice; it "does not demand an explanation that is persuasive, or even plausible." *Id.* at (¶49) (citations omitted). It is the third step of pretext where credibility of the explanation becomes relevant. *See Hardison*, 94 So. 3d at 1100 (¶25) (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

¶21.    The trial judge did not find defense counsel's reason credible – that bankers and farmers would be more security conscious, and thus more likely to find Love guilty. While one can reasonably anticipate that bankers would be security conscious, defense counsel did not explain why farmers would be more concerned with security than other potential jurors who worked in retail stores. Here, the trial court found the reason given by the defense was

pretextual, and there was actually a discriminatory motive for the defense to strike as many white people from the jury as possible. We leave fact-finding for the trial court, "plac[ing] our trust in the trial judges to determine whether or not a discriminatory motive underlies the [proponent of the strike]'s articulated reasons." *Lockett*, 517 So. 2d at 1352. Under the facts of this case, we cannot say that the trial court abused its discretion in finding a *Batson* violation.

## II. Hearsay Testimony

¶22. Love asserts that the trial court erred in allowing improper hearsay testimony of the State's witness, Tommie Richardson, who was Glandra's friend. The admission or suppression of evidence is within the discretion of the trial judge. The ruling will not be reversed unless there was an abuse of discretion. Reversal will occur only if the admission of evidence results in prejudice and harm to the opposing party. *Brown v. State*, 890 So. 2d 901, 914 (¶39) (Miss. 2004) (citation omitted).

¶23. During direct examination by the State, Richardson testified about their telephone conversation the morning Glandra was murdered:

A.   I called her that morning.

Q.   Yes, sir.

A.   I said, "You got company?" She said, "Yes." I said, "Greenville?" She said, "No." I said, "Indianola?" She said, "No." I said, "Down the street?" She said, "Yes."

Q.   Down the street?

A.   Uh-huh (affirmative response).

Q.     Had she, prior to this conversation, talked to you about someone down the street that she had been talking to?

A.     She told me once –

[DEFENSE COUNSEL]:   Objection to hearsay, Your Honor.

The trial court ultimately sustained the objection.

¶24.    The State then asked Richardson:

Q.     [Are] you personally aware, was she in a relationship with anyone?

A.     Yes.

Q.     Do you know who that person was?

[DEFENSE COUNSEL]:   Objection, your Honor.  It's going to be based on hearsay.  We've been through that.

[PROSECUTOR]:           Your Honor, I'm asking if he knows.

[DEFENSE COUNSEL]:   It's got to be something he personally saw . . . [b]ut not based on hearsay.

[BY THE COURT]:        Okay, not based on hearsay.

Q.     *Do you personally know if she was in a relationship with someone, sir?*

A.     Yes.

Q.     Do you know who that person was?

A.     Yes.

[BY THE COURT]:        How do you – ask him how he knows.

Q.     How do you know?

A.     *She told me.*

Q.     Did she identify that person to you?

10

A.     Yes.

Q.     Do you know that person, sir?

A.     *She identified him, she just told me who it was and where he lived.*

Q.     Okay. Did you know that person's name?

A.     No, I didn't.

Q.     Okay. Did you know where he lived?

A.     She told me down the street [from] where she lived.

(Emphasis added). While Richardson's information was based only on what the victim had told him, Love did not make any further objections or move to strike the response. Failure to raise a contemporaneous objection to a witness's testimony bars a party from raising the issue on appeal, and any error is waived. *Rubenstein v. State*, 941 So. 2d 735, 751 (¶27) (Miss. 2006) (quoting *Walker v. State*, 671 So. 2d 581, 597 (Miss. 1995)). Love only objected to Richardson's testifying about prior conversations he had had with Glandra regarding "someone down the street," and this objection was sustained by the trial court. Love did not object to Richardson's testimony that during their telephone conversation, Glandra said she had company from "down the street." Further, Love did not object to Richardson's statement that he personally knew Glandra was having a relationship with someone down the street. This issue is without merit.

¶25.   **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR. IRVING, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**